No. 13-1151

# In the United States Court of Appeals for the Fourth Circuit

_____

CRAIG LAMONT PERRY,
*Plaintiff-Appellant,*

v.

MAIL CONTRACTORS OF AMERICA, INC.,
*Defendant-Appellee*

_____

On Appeal from the United States District Court
for the Western District of North Carolina

_____

Appeal from the Judgment Order, dated November 21, 2013
of the United States District Court for the Western District
on North Carolina at Civil Action No. 3:12-cv-405

_____

**BRIEF OF APPELLANT**

_____

Ross S. Sohm, Esquire
The Law Firm of Ross S. Sohm, PLLC.
101 N. McDowell St.
Suite 110
Charlotte, NC 28204
704-804-8121
rsohm@sohmlaw.com

*Counsel for Appellant Craig Perry*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.     Does party/amicus have any parent corporations?                          YES     NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      YES     NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES      NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      YES      NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                        YES      NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************

I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____                    _____
(signature)                                       (date)

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement ................................................................ i

Table of Contents ..................................................................................... ii

Table of Cases and Authorities ............................................................... iv

Statement of Subject Matter and Appellate Jurisdiction ...........................1

Statement of Issues Presented for Review ................................................2

Statement of the Case................................................................................3

Statement of the Facts ..............................................................................4

Summary of Argument ............................................................................21

Argument .................................................................................................22

A. Standard of Appellate Review .......................................................... 22

B. Summary Judgment Standard ............................................................ 22

C. The District Court Failed to Correctly Apply the Summary Judgment
   Standard When Material Facts Are in Dispute ...................................... 24

D. The District Court Committed Error in Determining Perry Failed to Identify
   Similarly-Situated Comparators. ......................................................... 24

E. The District Court Erred in Its Application of the Similarly-Situated
   Analysis .............................................................................................. 27
   1. Appellant's Comparators are Similarly Situated to Appellant at the
      Time of the Alleged Discrimination ............................................. 28
   2. Appellant's Comparators Share a Common Decision Maker ...... 32
   3. The District Court Committed Error in Determining Appellant Was
      Not Similarly Situated to His Comparators Because Appellee Deemed
      Appellant's Accident to Be "Reckless" ........................................ 36

ii

4.  Appellant Has Provided Sufficient Evidence to Demonstrate that the Appellee's Legitimate, Nondiscriminatory Reasons for Terminating Him Are Merely Pretext for Unlawful Discrimination ................ 38

5.  The District Court Committed Error in Holding Wilbur Stevens in the Closest Comparator to Appellant .................................. 48

6.  The District Court Committed Error in Weighing Facts That Are Completely Absent From the Record. ......................................... 53

Conclusion .................................................................................54

Request for Oral Argument.......................................................55

Certificate of Compliance.........................................................56

Certificate of Service ...............................................................57

iii

# TABLE OF CASES AND AUTHORITIES

CASES                                              PAGE(S)

Adams v. Trustees of the Univ. of N.C.-Wilmington,
     640 F.3d 550, 556 (4th Cir. 1999).........................................23

Anderson v. Liberty Lobby,
     477 U.S. 242 (1986) ............................................................ xx

Blakenship v. Buchanan Gen. Hosp.,
     140 F. Supp. 2d 688 (W.D. Va 2001) .................................. xx

Bouchat v. Baltimore Ravens Football Club, Inc.,
     346 F.3d 514 (4th Cir. 2003)................................................ xx

Cook v. CSX Transp. Corp.,
     988 F. 2d 507 (4th Cir. 1993)............................................... xx

Deines v. Texas Dept. of Protective Services,
164 F.3d 277, 280-81 (5th Cir. 1999) ....................................... xx

Dennis v. Columbia Colleton Medical Center, Inc.,
     290 F.3d 639 (4th Cir. 2002)................................................ xx

Desert Palace, Inc. v. Costa,
     530 U.S. 90 (2003) .............................................................. xx

Disher v. Wilson,
     308 F. Supp. 2d 614 (M.D.N.C. 2004)............................... xx

Dockins v. Benchmark Communications,
     176 F.3d 745 (4th Cir. 1999)................................................ xx

Duggan v. Sisters of Charity Providence Hospitals,
     633 F. Supp. 2d 456 (D.S.C. 2009)..................................... xx

 Hill v. Lockheed Martin Logistics Management Inc.,
     354 F.3d 277 (4th Cir. 2004)................................................ xx

iv

Holland v. Washington Homes, Inc.,
    487 F.3d 208 (4th Cir. 2007) ................................................. xx

Humphries v. CBOCS West, Inc.,
    474 F.3d 387 (7th Cir. 2007).................................................. xx

Kelly v. United Parcel Service Inc.,
    2012 WL 3765180 (D.S.C. Aug 30, 2012) ........................ xx

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973) ...................................................... xx

Merrit v. Old Dominion Freigth Line, Inc.,
    601 F.3d 289 (4th Cir. 2010).................................................. xx

Murray v. Akima Corp.,
    2009 U.S. Dist LEXIS 20198 (E.D.N.C. 2009) ................. xx

Murray v. United Food & Comm. Workers Union,
    100 Fed. Appx. 165 (4th Cir. 2004) ...................................... xx

Richmond v. Oneok, Inc.,
    120 F.3d 205 (10th Cir. 1997)................................................ xx
Street v. United Parcel Service, Inc.,
    822 F. Supp. 2d 1357 (M.D. Ga 2011)............................... xx

Texas Dept. of Community Affairs v. Burdine,
    450 U.S. 248 (1981) ............................................... xx

## STATUTES

Title VII, 42 U.S.C. §2000e, *et. seq.* ......................................... xx

28 U.S.C. §1291 ....................................................... xx

Fed. R. Evid. 803 ......................................................... xx

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Plaintiff Craig Perry filed this action alleging race discrimination in violation of Title VII, 42 U.S.C. §2000e, *et seq.,* as amended by the Civil Rights Act of 1991. The United States District Court for the Western District of North Carolina exercised subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 which grants federal question jurisdiction to district courts of the United States.

The Court of Appeals for the Fourth Circuit has appellate jurisdiction pursuant to 28 U.S.C. §1291 which grants appellate review of final decision of district courts of the United States.

Counsel certifies that the instant appeal arises from a final decision of the District Court. The District Court entered an Order of Court, dated November 21, 2013 granting the Motion for Summary Judgment of the Defendant. On December 18, 2013, Plaintiff sought post-judgment relief pursuant to Rule 59(e) of the Federal Rules of Civil Procedure by filing a Motion for Reconsideration with the District Court. The District Court entered an Order of Court, dated January 22, 2014 denying the Motion for Reconsideration of the Plaintiff. The notice of appeal was timely filed on February 19, 2014.

## <u>STATEMENT OF THE ISSUES PRESENTED</u>

I.  Whether the District Court committed error in granting MCA's Motion for Summary Judgment on Perry's disparate treatment claim, because the District Court improperly weighed conflicting evidence and failed to draw all inferences in the light most favorable to Perry?

II. Whether the district court committed an error of law in granting summary judgment regarding plaintiff's claim of race discrimination in finding that Plaintiff/Appellant failed to demonstrate that similarly situated comparators were treated differently than Plaintiff/Appellant.

## STATEMENT OF THE CASE

The Appellant, Craig Perry, filed suit with the United States District Court for the Western District of North Carolina (Charlotte Division) on June 29, 2012, alleging violations of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.* See Joint Appendix ("JA") at 6-12. Mr. Perry alleged, in pertinent part that the Appellee subjected him to disparate discipline due to his race (African American) when the Appellee discharged him after having his first company reportable accident that was determined to be preventable by the Appellee. See JA at 9. On June 10, 2013, the Appellee filed a Motion for Summary Judgment requesting dismissal of Appellant's claim of discrimination. See JA at 3. On July 5, 2013, Appellant filed an Opposition to the Appellee's Motion for Summary Judgment[1]. See JA at 3. On August 5, 2013, the Appellee filed a reply to Appellant's Opposition. See JA at 4. The District Court granted summary judgment on November 21, 2013 in favor of the Appellee, finding that Appellant had failed to demonstrate that similarly situated comparators were treated differently. See JA at 355-366. On December 18, 2013, Appellant filed a Motion to Reconsider the Courts November 21, 2013 order and denied the same on January 22, 2014. See JA at 5. On February 19, 2014, Mr. Perry filed a timely appeal from the final judgment. See JA at 5, 368.

---

[1] Appellant filed an Amended Opposition to the Appellee's Motion for Summary Judgment on July 17, 2013 after obtaining a consent order that was granted by the District Court on July 15, 2013. See JA at 4.

3

## STATEMENT OF FACTS

**A. Plaintiff's Employment with MCA**

Plaintiff, Mr. Craig Perry (hereinafter "Perry" or "Appellant"), an African-American male, has been a professional commercial truck driver for approximately thirteen (13) years. See JA at 58-63. In 2007, Perry was hired by Appellee ("MCA") as a commercial truck driver. See JA at 63. As an employee of MCA, Plaintiff was assigned to drive a tractor-trailer (an 18-wheeler) transporting USPS mail on various routes, with his last route from Columbia, South Carolina to a Terminal in Greensboro, North Carolina. See JA at 64. Perry's employment with MCA was terminated after his involvement in a vehicular accident that occurred on November 28, 2011. See JA at 150,271. Prior to Perry's accident on November 28, 2011, Plaintiff had never been involved in any prior accidents nor had he received any written warnings regarding his driving behavior. See JA at 333 ¶6; JA at 8 ¶ 15. Throughout the course of Perry's employment with MCA, Perry received numerous "safe driver" awards for his hours of service as a truck driver. See JA at 7 ¶9.

On November 28, 2011, while under the employ of Appellee, Perry was involved in an unavoidable accident; all traffic citations received by Perry as a result of this accident were *dismissed* and *no charges* were placed on Perry's driving record. See JA at 106. On or around December 19, 2011, after

4

approximately three weeks on suspension, Mr. John Donnelly, Perry's terminal manager, first notified Perry that his accident had been deemed "preventable" and as a result, Perry was being terminated. See JA at 150, 271, 282. Perry immediately appealed MCA's decision on December 29, 2011. See JA at 282-283. Having appealed this decision, MCA's "Accident Re-Determination Committee" determined that Perry's accident was solely "preventable," and was absent any indication of Perry's accident being classified as the undefined "reckless" used by Appellee to justify Perry's termination. See JA at 285, 326. Pursuant to MCA's driver accident policy, an accident deemed to be "preventable" will not result in termination of an employee unless that employee had been involved in another "preventable" accident in the two years prior. See JA at 140-141, 265. Here, Perry had never been involved in any "preventable" accident prior to November 28, 2011, yet MCA still moved to terminate him.

## B. Perry's minor Traffic Accident

During Perry's employment with MCA, he had never been in any form of accident until November 28, 2011. See JA at 333 ¶6; JA at 8 ¶ 15. On November 28, 2011, while Perry was driving an MCA tractor-trailer from the Greensboro Terminal to the Columbia Domicile, Perry was involved in a traffic accident. See JA at 97-111. At approximately 2:45 a.m., Perry was traveling south on Interstate

5

77 near Blythewood, South Carolina. See JA at 81-82. There was a light mist falling at the time. See JA at 82.

As Perry approached the exit/entrance ramps at Blythewood, South Carolina, Perry was driving in the far left lane. See JA at 84, 268-269. The Blythewood exit, the entrance ramp to Interstate 77, creates a third far right lane. See JA at 85. Perry knew that beginning in Blythewood, tractor-trailers were prohibited in the far left lane of Interstate 77. See JA at 87. Perry therefore merged into the middle lane. Id. Perry was going approximately ten (10) miles per hour under the posted speed limit of 70 miles per hour at an estimated 60 miles per hour as he merged into the middle lane and approached the Blythewood exit. See JA at 90.

When Perry moved to the middle lane, a car that was behind Perry in the far left lane, accelerated and drove up in the left lane next to Perry. See JA at 88. Perry was attempting to move into the far right lane. See JA at 105. At the same time, a car was entering the Interstate from the right, and the car rapidly accelerated as it entered the interstate until it was next to Perry in the right lane. See JA at 88-89. Consequently, Perry was in the middle lane with a car in the immediate left and right lanes.

6

At the same time, Perry began approaching a vehicle directly in front of him. See JA at 88. The vehicle in front of him was a slow moving dark blue bus with very dim taillights making it difficult to see in the misty air. See JA at 88, 93. Due to the accelerating vehicle to Perry's right, Perry could not merge left or right due to the cars in the left and right lanes causing him to be sandwiched in his current lane; instead, Perry, left with no other alternative, slammed on his brakes in an attempt to avoid hitting the bus. See JA at 89-90. Unfortunately, due to the extremely slow speed of the bus, Perry was unable to completely avoid a collision and Perry's left fender of his tractor trailer lightly struck the right bumper of the bus causing a collision with the right back corner of the bus. See JA at 87, 268-269.

Following the traffic accident, Perry and the driver of the bus both pulled over and inspected the damage. See JA at 92. Both vehicles suffered minor damage; a piece of the tractor trailer's left bottom bumper was damaged and the bus shattered some glass in the rear emergency door along with a little dent in its bumper. See JA at 92-93. Perry took pictures of the damage to the vehicles. See JA at 100-101. More importantly, nobody was injured as a result of the accident. See JA at 92, 155.

After Perry and the other driver had exchanged information, an officer from the South Carolina Highway Patrol arrived and prepared an accident

7

report.  See JA at 92-93, 268-269. Plaintiff was issued a traffic citation for driving "too fast for conditions" by the South Carolina Highway Patrol, which was subsequently dismissed. *See JA at 282-283.*

### C. Accident Evaluation Policy and Procedure

According to MCA's accident evaluation policy and procedure, when a MCA truck driver is involved in a traffic accident, he or she must report the accident to MCA if the accident is a company reportable accident. See JA at 28 ¶26, 278-277. A "company reportable accident" is explained in MCA's Employee Reportable Vehicle Accident Policy as "any event whereby any company vehicle whether owned, leased, or rented, comes in contact with anything other than the normal driven portion of the roadways" which results in any vehicle damage, monetary loss, and/or equipment and/or driver downtime. See JA at 273.

After a MCA driver has a company reportable accident, the driver will verbally contact an Operations Supervisor (commonly referred to as Dispatch) and that Operations Supervisor beings compiling an accident file. See JA at 28 ¶26. Within 24 hours of the accident, the driver will also provide a verbal statement concerning the facts and circumstances surrounding the accident to a representative of MCA's Home Office Safety Department, as well as complete

and submit a written report explaining the accident in the driver's words. See JA at 28 ¶29. MCA's Home Office Safety Department will compile all the documentation into an accident review file. See JA at 29 ¶29. The driver's accident file is then reviewed by three (3) members of MCA's management known as the "Accident Review Committee" normally comprised of the driver's Terminal Manager, MCA's Safety Director, and MCA's Safety Administrator, in which each member will typically review a transcribed verbal statement prepared by the truck driver, traffic citations (if any), witness statements (if any), and any other factors relevant to the specific traffic accident. See JA at 29. Specific to Perry's accident review file, it was specifically acknowledged that the Accident Determination Committee members received and reviewed documents which specifically disclosed Perry's race. See JA at 247-248, 329.

After reviewing the aforementioned information, each member determines whether the accident falls into one of two classification labels defined by the American Trucking Association Guidelines and expressly adopted in MCA written policy. See JA at 279. These classifications are:

> "(a) Non-Preventable Accident – The Employee did not contribute to the cause of the accident.
>
> (b) Preventable Accident- The Employee was the primary cause of the accident, OR he/she failed to exercise the proper amount of precaution and defensive driving techniques reasonably expected to prevent the accident."

See JA at 279.

The members of the Accident Determination Committee then votes on whether the accident was "preventable" or "non-preventable" under the above definitions. See JA at 279. If an employee is involved in a "preventable" accident within their first ninety (90) days of employment, they are terminated. See JA at 265. If the employee has been employed for more than ninety (90) days and had a prior preventable accident within the last two (2) year, the truck driver will be terminated. See JA at 265. If the employee has been employed for more than ninety (90) days and has not had a prior preventable accident within the last two (2) year period, the truck driver will be placed on a probationary period of two (2) years and will be terminated if a second accident occurs within the two (2) year period. See JA at 30 ¶¶36-37, 265.

Barring anything unforeseen happening, Bruce Wrinkle (Safety Director) and Lynda Terry (Safety Administrator) will always be voting participants on this committee. See JA at 144-145. A representative in the Human Resource department will normally participate on this committee as a non-voting participant. See JA at 29 ¶30. Based on the majority vote of the Accident Review Committee members, the employee's terminal manager then requests approval of the appropriate disciplinary action under MCA's policy. See JA at 30, 140.

10

### D. MCA's Discriminatory Factor, the Undefined "Reckless" Standard

Despite having no written policy or guideline referencing a "Reckless" determination, Appellee alleges that if the Accident Review Commitment deems the accident to be "preventable" then the committee members will make a second determination to decide whether the accident rose to the level of recklessness. See JA at 30 ¶39. However, Mr. John Donnelly, MCA's designated representative, specifically states that both the Accident Review Committee and the Accident Re-determination Committee does not determine whether an accident rises to the level of "recklessness." See JA at 245-246. More importantly, Mr. Donnelly expressly states that there is no enumerated guideline or written policy that defines or even indirectly mentions how a determination of recklessness is made; there is no proof such a determination is a standard used in MCA's accident review process. See JA at 140. According to MCA's policy, "MCA evaluates Employee performance with respect to accidents based on **frequency, severity,** and **preventability**;" this policy does not mention recklessness. See JA at 279.  Thus, MCA's decision to classify any driver's accident as reckless is purely a weak attempt to justify Defendant's discriminatory termination of Plaintiff.

Appellee also identifies a "Conduct Committee" made up of MCA's in-house counsel and a member of MCA's HR department. See JA at 30 ¶39. This

11

Conduct Committee is not mentioned anywhere in MCA's Employee Hand Book or Employee Reportable Vehicle Accident Policy. See JA at 263-267, 273-280. This Conduct Committee appears, at most, to be MCA's legal review process in approving a terminal manager's request for terminating an employee. As in Mr. Perry's case, the request to terminate his employment was made the same day the Accident Determination Committee made its determination of preventability and was sent to MCA's in-house counsel, aka "the Conduct Committee" for the legal department's approval. See JA at 145-148.

### E. MCA's Accident Re-Determination Committee

In the same correspondence given to a driver notifying them of MCA's termination decision, the driver is also notified of their right to appeal the disciplinary decision by requesting a re-determination via MCA's Accident Re-Determination Committee. See JA at 271. If the employee appeals the decision, the Re-Determination Committee "will make a **new** determination without knowledge of the original preventability determination or the [e]mployee's identity." See JA at 279. Once MCA receives an employee's appeal request, MCA's Safety Department will remove or strike out any reference to the original preventability decision and the [e]mployee's name or the preventability determination," before sending the request to the Re-Determination committee. See JA at 279. The Re-Determination Committee then makes the new

12

determination based on the Employee's appeal and the information in the accident file, thus the outcome could be more or less favorable than the original determination. See JA at 279-280. Once a new determination is made, "the decision of the Re-Determination Committee is deemed the final [MCA] decision regarding the matter." See JA at 280, 285.

Mr. Perry, appealed his termination with MCA's Accident Re-Determination Committee in which Mr. Perry was found to be "preventable," but not reckless on December 19, 2011. See JA at 285, 326. Despite, this decision being deemed the final decision regarding Mr. Perry's accident and being completely devoid of a "reckless" finding, MCA still upheld Mr. Perry's termination. See JA at 285, 326.

## F. Defendant's Discipline of other drivers involved in accidents determined to be "Preventable."

Significantly, numerous other white drivers did not suffer the same discipline for company reportable accidents that MCA deemed to be "preventable."

### 1. Dennis Dowd

In June 2005, Dennis Dowd, a full-time, Caucasian MCA driver, was involved in a company reportable accident that MCA deemed to be preventable.

13

See JA at 304. The only discipline Mr. Dowd received was a verbal warning that stated, "[i]n the future, I would ask that you take all safety precautions necessary to avoid unnecessary damage to company property or equipment." See JA at 304. In October 2006, Mr. Dowd was involved in another company reportable accident that MCA deemed to be "non-preventable" in which he struck a deer. See JA at 305. Mr. Dowd received no discipline as a result of this second accident. See JA at 305. In November 2008, Mr. Dowd was involved in a third company reportable accident that was deemed non-preventable and no disciplinary action was taken. See JA at 337.

In April 2011, Mr. Dowd had a fourth company reportable accident that MCA's Accident Determination Committee voting members Bruce Wrinkle, Lynda Terry, and Keith Close deemed "preventable." See JA at 302-303. Mr. Dowd while traveling at 62 miles per an hour, had struck another vehicle while changing lanes. See JA at 302. Mr. Dowd stated that he was traveling about sixty-two miles per hour when the accident occurred and received a citation for failure to speed up to make a proper lane change. See JA at 302. However, Mr. Dowd was not terminated and is still employed by Defendant. See JA at 300-301. Instead, after the Accident Review Committee determined that his accident was preventable, Mr. Dowd was given a final written warning and was placed on

14

critical notice for a period of twelve (12) months, not two (2) years as required under company policy. See JA at 300-301.

Similar to Plaintiff's accident, the Accident Review Committee was comprised of both common decision makers Bruce Wrinkle and Lynda Terry, a citation was issued, damage was caused to both vehicles, and no injuries resulted from the accident. See JA at 268-269, 305.

### 2. Samuel Dillon

In April 2009, Samuel Dillon, a full-time Caucasian MCA driver, lost control of his tractor-trailer to avoid hitting a deer, which caused Mr. Dillon to "total" his tractor-trailer beyond repair. See JA at 297, 333 ¶9. Additionally, a citation for reckless driving was issued. See JA at 306. MCA's Accident Determination Committee including common voting member Lynda Terry, found Dillon's accident to be preventable and acknowledged that swerving to avoid a deer is against MCA policy. See JA at 297. As a result, Dillon received a final written warning and was not discharged, but instead was placed on critical notice for a period of twelve (12) months, not two (2) years as required by company policy. See JA at 296. Additionally, Mr. Dillon was never placed on a safety hold and was back at work driving the very next day. See JA at 333 ¶9.

In January 2011, Samuel Dillon was involved in a second company reportable accident in which he hit another vehicle at an intersection while backing up to make a U-turn. See JA at 294, 333 ¶10. The Accident Determination Committee voting members included Lynda Terry and Bruce Wrinkle whom also determined that this accident was preventable. See JA at 294.

Although this second preventable accident occurred within his two-year critical notice period, Dillon was not terminated, against MCA's policy. See JA at 298-299, 333 ¶ 10. Instead, after an assessment by the Accident Determination Committee, he received another final written warning letter and was again placed on critical notice for a period of twelve (12) months, not two (2) years as is required under MCA policy. See JA at 298-299.

Similar to Perry's Accident Determination Committee, Mr. Dillon's 2009 Accident Determination Committee consisted of voting member Lynda Terry. Similar to Perry's Accident Determination Committee, Mr. Dillon's 2011 committee members consisted of both voting members Bruce Wrinkle and Lynda Terry. See JA at 294,268-269. Additionally, similar to Perry, damage was caused to both vehicles, and no injuries resulted from the accident. See JA at 294,268-269.

### 3. William Tillery

In February 2009, William Tillery, a full-time Caucasian MCA driver was involved in a company reportable accident in which he struck another vehicle while changing lanes. <u>See</u> JA at 307, 353. Similar to Mr. Perry's accident, the left front bumper of Mr. Tillery's tractor-trailer collided with the other vehicle's back right rear bumper. <u>See</u> JA at 307. As stated by one of the voting members, "He drives this route daily…we hit this car with our left front corner. All the driver need do is look out the window..." <u>See</u> JA at 307. The Accident Determination Committee consisting of common voting member Lynda Terry determined that Mr. Tillery's accident was preventable. <u>See</u> JA at 307. Nevertheless, he was not terminated after MCA's assessment by the Accident Determination Committee, but was given a final written warning and was placed on critical notice for twelve (12) months, not two (2) years as required by MCA's policy. <u>See</u> JA at 308.

Similar to Perry, Tillery's Accident Determination Committee consisted of common voting member Lynda Terry, the tractor-trailer collided with the other vehicle's back right rear bumper, there was damage to both vehicles, and the driver drove the route in which the accident occurred regularly. <u>See</u> JA at 307, 268-269.

### 4. Paul Bydalek

In September 2008, Paul Bydalek, a full-time Caucasian MCA driver, was involved in a company reportable accident in which he forgot to engage his

17

parking break, and as a result, his truck rolled into another truck in MCA's truck yard. <u>See</u> JA at 315. The Accident Review Committee found that Bydalek's accident was preventable. <u>See</u> JA at 315. Nevertheless, he was not terminated, and is still currently employed by MCA as a driver. <u>See</u> JA at 316. Instead, like the other Caucasian drivers already discussed, he was given a final written warning and was placed on critical notice for a period of twelve (12) months, not two (2) years as is required by MCA policy. <u>See</u> JA at 316.

### 5. Larry Powell

In February 2010, Larry Powell, a full-time African-American MCA driver, was involved in a company reportable accident in which he lightly grazed another vehicle. <u>See</u> JA at 309, 332-333 ¶¶ 4-5,12. The Accident Determination Committee including voting members Bruce Campbell and Lynda Terry found that Mr. Powell's accident was preventable without any reference to a "reckless" determination in their notes. <u>See</u> JA at 309.  However, Mr. Powell was still terminated as a result on March 5, 2010. <u>See</u> JA at 310. Unlike Mr. Perry, Mr. Powell did not make any contact with the rear of the other vehicle, but merely made contact with the side of the vehicle. <u>See</u> JA at 309-310.  Like Mr. Perry, the accident did not result in any injuries, he was on a safety hold for several weeks, he had never been involved in any prior accidents, and both Lynda Terry and Bruce Wrinkle were on the Accident Review Committee that made the

18

determination of "preventable." See JA at 309, 333 ¶¶ 7,12. Most significantly, like Plaintiff, Mr. Powell was an African American driver. See JA at 333 ¶5.

After Mr. Powell was terminated, like Plaintiff, he appealed his termination to MCA Re-Determination Committee, which also ultimately found the accident to be "preventable" without any mention of recklessness. See JA at 311-312. Also like Plaintiff, Mr. Powell's Re-Determination Committee also consisted of voting members Larry Boone, Terry Baker, and Ed Felks. See JA at 311, 326. Also, like Perry, Mr. Powell was later informed of the Re-Determination Committee's findings and MCA's decision to uphold the termination. See JA at 285, 312.

### 6. James Doss

In April 2010, James Doss, a part-time "casual" Caucasian MCA driver, was involved in a company reportable accident when he struck a pole while backing his truck into a loading dock. See JA at 321. MCA's Accident Determination Committee including voting members Bruce Wrinkle and Lynda Terry determined that Doss's accident was preventable. See JA at 321.

Less than a month later, in May 2010, Mr. Doss was involved in a second company reportable accident when he hit another truck while backing up into a loading dock. See JA at 322. Like before, MCA's Accident Determination

19

Committee found again including voting members Lynda Terry and Bruce Wrinkle determined that Doss's accident was preventable, and he was not terminated despite MCA's clear policy regarding back to back preventable accidents as evidenced by yet another accident. <u>See</u> JA at 322-323.

Within less than one year later, in April 2011, Mr. Doss was involved in a third company reportable accident when he hit another vehicle while he was pulling out of a gas station. <u>See</u> JA at 323. Similar to his prior two accidents, MCA's Accident Determination Committee again consisting of voting members Lynda Terry and Bruce Wrinkle determined that this accident was preventable. <u>See</u> JA at 323. The record is unclear whether Mr. Doss was terminated as a result of this third accident. Similar to Perry, Lynda Terry and Bruce Wrinkle voting members on all of Mr. Doss' Accident Determination Committees. <u>See</u> JA at 321-323.

### 7.  Wilbur Stevens

In May 2010, Wilbur Stevens, a part-time "casual" Caucasian MCA driver, was involved in a company reportable accident that was deemed "non-preventable" by MCA's Accident Determination Committee including voting members Bruce Wrinkle and Lynda Terry. <u>See</u> JA at 286, 289-290. On November 17, 2011, Mr. Stevens was involved in a second company reportable accident in which Mr. Stevens' tractor trailer collided with the rear end of another

20

multi-passenger vehicle at high speed. <u>See</u> JA at 289. Mr. Stevens had just set his tractor-trailer on cruise control at 60 miles per an hour, in heavy traffic conditions, despite noticing there was a much slower moving car directly in front of him. <u>See</u> JA at 289. Not realizing he was traveling 15 miles per an hour ***over the posted speed limit*** of 45 miles per hour and how fast he was approaching the other vehicle, Mr. Stevens violently slammed into the rear of other vehicle at 60 miles per an hour. <u>See</u> JA at 289. As a result of Mr. Steven's accident, three (3) passengers in the other vehicle were transported from the scene via ambulance, both the other vehicle and Mr. Stevens tractor trailer had extensive damage, and Mr. Stevens received a citation for "too fast for conditions." <u>See</u> JA at 289,291. On November 23, 2011, the Accident Determination Committee found that Mr. Stevens' accident was both preventable and reckless citing mainly too fast for conditions. <u>See</u> JA at 289. A month later, Mr. Stevens was first notified of his termination of employment on December 20, 2013. <u>See</u> JA at 164, 287.

## SUMMARY OF THE ARGUMENT

In reading the facts presented by Appellant in the light most favorable to him, the Appellee is not entitled to summary judgment as a matter of law because there are genuine issues of material fact, which therefore require a trial. Appellant has established facts that satisfy his prima face burden of proof, evidence that shows the Appellee's legitimate, nondiscriminatory reasons for Appellant's

termination of employment are merely a pretext for discrimination because there are no similarly-situated employees outside of Appellant's race who were subjected to the severity of penalty for the same conduct.

## ARGUMENT

### A.    STANDARD OF APPELLATE REVIEW

Appellate review of summary judgment is *de novo*, with the facts read in the light most favorable to the non-moving party, all reasonable inferences drawn in the non-moving party's favor. Holland v. Washington Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007); Fed. R. Civ. P. 56(c). Thus, the question is whether the undisputed material facts presented here warrant judgment for the Appellee, or alternatively, if such facts demand a trial for Appellant. *See* Fed. R. Civ. P. 56(c)(2); Merrit v. Old Dominion Freight Line, Inc., 601 F.3d 289, 295 (4th Cir. 2010).

### B. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th

Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. *Id*. An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. *See* Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. *See* Anderson, 477 U.S. at 248. Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. *See* Id. at 249. In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. In considering the facts for the purposes of a summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

Summary judgment is not appropriate when the resolution of a case is likely to turn on witness credibility. *See* McCray v. Pee Dee Regional Transportation Authority, 263 Fed. Appx. 301, 303 (4th Cir. 2008) *citing* Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991). The determination of the credibility of witnesses and resolution of conflicting testimony falls within the purview of the

23

fact finder and not the reviewing court on summary judgment. *See* <u>Dockins v. Benchmark Communications</u>, 176 F.3d 745, 751 (4th Cir. 1999).

**C. The District Court Failed to Correctly Apply the Summary Judgment Standard When Material Facts Are In Dispute.**

The Court, throughout its Opinion, sets forth material facts that it asserts are undisputed. Many of the material facts listed by the Court are disputed by clear contradicting evidence, and they affect the outcome as discussed in more detail throughout Appellant's argument.

**D. The District Court Committed Error in Determining Perry Failed to Identify Similarly-Situated Comparators.**

As in most Title VII claims, where the discrimination is based on circumstantial evidence, Perry generally proceeds under the familiar burden-shifting framework articulated by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

However, Perry has specifically pled that MCA's disciplinary decisions regarding employee accidents are racially discriminatory. <u>See</u> JA at 9 ¶22. As such, to establish his *prima facie* case, Perry must show: (1) that he is a member of a protected class (i.e., that he is African-American); (2) that the prohibited conduct in which he engaged was comparable in seriousness to the misconduct of

24

employees outside the protected class (i.e., that Plaintiff's company reportable accident was comparable in its seriousness to other accidents of MCA employees who were not African-American); and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees (i.e., that MCA's disciplinary measures regarding Perry's accident were more severe than those taken against other white MCA drivers). *See* Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993).

It is undisputed by the parties that Mr. Perry is an African-American, which is a protected class under Title VII. See JA at 13 ¶ 2. Thus, the first element is met. To satisfy the second and third elements, Perry must first show that other employees outside of his protected class were subjected to a lesser discipline for the same offense. *See* Cook, 988 F.2d at 511 (explaining that if employees are disciplined under the same employer rule or policy, then they engaged in conduct that was comparable in its seriousness.)

Perry was ultimately terminated as a result of MCA's racially inconsistent application of discipline associated with company reportable accidents that are determined to be "preventable," through MCA's accident evaluation policy and procedure. Appellee's disciplinary actions regarding preventable accidents are governed by MCA's employee handbook:

**"Discipline Associated With Accidents**

25

### A. Preventable Accidents (Drivers Only)

In the **FIRST** Preventable accident within the last two (2) years, the Driver will receive two (2) **days suspension** without pay (or) a final warning letter in lieu of suspension; (and) be placed on **Critical Notice** for two (2) years. If the Driver has a **SECOND** accident … within the two (2) year Critical Notice period, the Driver normally will be terminated."

<u>See</u> JA at 265.

As previously discussed in detail and incorporated herein, Perry has identified several white MCA drivers that were all involved in one or more "preventable" accidents, but were not subjected to the same disciplinary action as Mr. Perry. That being, none of the white MCA drivers were terminated as a result of these accidents.  These drivers are Dennis Dowd, Samuel Dillon, William Tillery, Paul Bydalek, and James Doss. Most importantly, all of these white drivers were punished under the same disciplinary rules applicable to company reportable accidents deemed to be "preventable". *See* <u>Cook</u>, 988 F.2d at 511 (explaining that if employees are disciplined under the same employer rule, then they engaged in conduct that was comparable in its seriousness). Although it cannot be disputed that any of these employees' company reportable accidents (that were determined by MCA to have been preventable) are exactly identical to Plaintiff's November 2011 accident, and that they all occurred at different times, they are comparable when looking at the totality of the circumstances for purposes of determining Plaintiff's *prima facie* case. As stated in <u>Cook</u>, "the

26

comparison *will never* precisely involve the same set of work-related offenses *occurring over the same period of time* and under the same set of circumstances. <u>Cook</u>, 988 F.2d at 511 (*referencing* <u>Moore v. Charlotte</u>, 754 F.2d 1100, 1107-11 (4th Cir. 1985).

Thus, since Dennis Dowd, Samuel Dillon, William Tillery, Paul Bydalek, and James Doss were all full-time drivers that were involved in preventable accidents and none of them were terminated, Plaintiff sufficiently satisfies the second and third elements of his *prima facie* case.

## E. The District Court Erred in Its Application of The Similarly-Situated Analysis.

The District Court held that Appellant failed to state a claim for race discrimination because Plaintiff failed to demonstrate that similarly situated white drivers were treated differently. <u>See</u> JA at 366. The District Court made its ruling on the basis that the comparators identified by Perry each had accidents during different time periods than Plaintiff's accident, "…each had a different supervisor than Perry, different members of the Accident Review Committee reviewed each of their accidents, and each had a different and less severe type of traffic accident than Perry," because the Defendant's Accident Review Committee did not consider any of the comparator's accidents to be "reckless."

<u>See</u> JA at 364. However, as explained herein, the holding and analysis applied in the order was in clear error.

### 1. Appellant's Comparators are Similarly Situated to Appellant at the Time of the Alleged Discrimination.

First, the District Court held that the differing time periods between the identified comparators accidents and Plaintiff's is dispositive of his claim based on the unpublished cases of <u>Sampson v. City of Cambridge</u>, Civ A. No. WDQ-06-1819, 2008 U.S. Dist. LEXIS 112393 at *20, D. Md. June 5, 2008) and <u>Williams v. Commonwealth of Virginia, Dep't of Soc. Servs.</u>, Civ. A. No. 3:93CV688, 1995 WL 848669, 24 (E.D. Va. Aug. 21, 1995). <u>See</u> JA at 363-364. These cases both refer to a general principal that a comparator must be similarly situated to plaintiff at the time of alleged discrimination. However, this principal is wholly inapplicable in the context of disparate discipline case as the context of these cases related to discrimination based on a failure to promote or a reduction in force, not disparate discipline. Regardless, the undersigned in not aware of any legal precedent that so narrowly and literally construes this standard to require a specific time proximity between the occurrences of the differing disciplinary actions that Perry claims is discriminatory. Put simply, in circumstances where two employees are subject to the same procedure, policies and decision makers

for a particular type of conduct, the resulting disciplinary action taken should be consistent whether the conduct occurred ten years ago or ten days ago.

To be deemed "similarly-situated" in the disparate discipline context, "the individuals with whom Perry seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Mitchell v. Toledo Hospital</u>, 964 F.2d 577, 583 (6th Cir. 1992); *See also* <u>Tex. Dep't of Comty. Affairs v. Burdine</u>, 450 U.S. 248, 258 (1981). These factors ***generally*** are all relevant considerations in cases alleging differential disciplinary action. *See* <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 802 (6th Cir. 1994). The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as held in <u>Pierce</u>, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the relevant aspects." <u>Pierce</u>, 40 F.3d at 802 (emphasis added).

Further, the facts of Mr. Perry's case are readily distinguishable from <u>Sampson</u> and <u>Williams</u>. In <u>Sampson</u>, the plaintiff claimed she was discriminated against due to the Defendant's ***failure to promote*** her into a position she applied for. The plaintiff in <u>Sampson</u> attempted to compare a position she filled in 2005

29

to a *different but similar* position filled in 1992. <u>Sampson</u>, 2008 U.S. Dist. LEXIS 112393 at *20-21. The Court in <u>Sampson</u>, merely cited to the, "similarly situated during the relevant time period" standard, to illustrate its holding that the Plaintiff had not provided any evidence that the position in 1992 was the same as that for which the Plaintiff had applied in 2005. <u>Id</u>.  Notably, despite a gap of thirteen (13) years, the Courts only inquiry was whether the Plaintiff had presented evidence that the two position were identical, not the disparity of time.

 In <u>Williams</u>, 995 WL 848669, *24, the plaintiff alleged discrimination after her position was eliminated as a result of a ***reduction in force***. The Plaintiff submitted comparator evidence pertaining to events that occurred ***after*** the plaintiff was terminated and the two comparators the plaintiff identified worked in different divisions under different supervisors. Thus, the Court held the two comparators were not similarly situated during the relevant time period because those incidents occurred after the plaintiff was fired. <u>Id</u>.

Thus, for a comparator to be similarly situated during the relevant time period simply requires that at the time of the comparator's discipline, he/she (1) dealt with a common decision maker, (2) was subject to the same standards and (3) had engaged in similar conduct (without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it) at the time of the Plaintiff's discipline. See <u>Mitchell</u>, 964 F.2d at 583.

30

The disparity in time between the disciplinary actions are simply not relevant in a disparate discipline case if Appellant satisfies these three elements. The Plaintiff is simply "required to prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-minority's] employment situation." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir.1994) (emphasis added).

In the present case, every disciplinary proceeding cited by both parties occurred within a period ranging from six years to seven month prior to Plaintiff's termination of employment, all occurring *during* Plaintiff's employment with Defendant, all involving *common decision makers* Bruce Wrinkle and Lynda Terry, all disciplinary action was subject to the *same disciplinary policy*, and all engaged in the similar conduct of being involved in a company reportable accident. See JA at 268,286,289,294,297,302,307,309,321-323. Again, as stated in Cook, "the comparison *will never* precisely involve the same set of work-related offenses *occurring over the same period of time* and under the same set of circumstances. Cook, 988 F.2d at 511 (*referencing* Moore v. Charlotte, 754 F.2d 1100, 1107-11 (4th Cir. 1985).

Thus, the District Court committed reversible error in holding Perry's comparators were not similarly-situated because their accidents occurred during different time periods.

31

### 2. __Appellant's Comparators Share a Common Decision Maker__

The District Court further held the comparators identified by Perry each

had a different supervisors than him for purposes of the similarly situated

analysis relying on Duggan v. Sisters of Charity Providence Hospitals, 663 F.

Supp. 2d 456, 463 (D.S.C. 2009)(holding that plaintiff must show the same

decision maker had knowledge of the misconduct by others outside the protected

class to impute liability of the employer); *See also* Hill v. Lockheed Martin

Logistics Management, Inc., 354 F.3d 277, 297 (4th Cir. 2004). See JA at 363-

364. The inquiry the Court must determine is not whether the comparators had a

common supervisor in the most literal sense, but whether the employees in which

Perry seeks to compare himself to actually shared in common an "actual decision

maker or the one principally responsible for [MCA's] decision to terminate

[him]." *See* Hill, at 297.

Further, "the lack of a common supervisor does not necessarily undermine

[Perry's] prima face case," as in determining "whether two employees are

similarly situated a court must look at all relevant factors, the number of which

depends on the context of the case." Disher v. Wilson, 308 F. Supp. 2d 614, 621

(M.D.N.C 2004) *citing* Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th

Cir. 2000). In a disparate disciplinary claim, the requirement that the comparator

"dealt with the same supervisor" is not so narrowly construed to require that

32

comparators have an identical chain of command, especially when as here the

Terminal Manager is not the ultimate decision maker. As appropriately stated by

the Seventh Circuit in Humphreys:

> "This requirement should not be applied mechanically or inflexibly…In other words, we have emphasized that the similarly situated inquiry is a flexible one that considers all relevant factors, the number of which depends on the context of the case. As to the relevant factors, an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity. In addition, our case law does not provide any 'magic formula' for determining whether someone is similarly situated. Instead, courts should apply a 'common-sense' factual inquiry—**essentially, are there enough common features between the individuals to allow a meaningful comparison**? Put a different way, the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination. It is important not to lose sight of the common-sense aspect of this inquiry. It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees—distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions...In other words, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination…"

> Humphries v. CBOCS West, Inc., 474 F.3d 387, 405 (7th Cir. 2007), *aff'd on other grounds*, 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008)(internal citation omitted)(emphasis added).

While, the lack of a common supervisor alone would not undermine

Perry's prima facie case, it is plain error to disregard the undisputed evidence that

33

both Lynda Terry and Bruce Wrinkle were decision makers common to all of

Perry's identified comparators (except Paul Bydalek) and they jointly held the

majority decision making authority on Dennis Dowd's, Samuel Dillion's, James

Doss's, Larry Powell's, and Perry's  Accident Review Committees,[2] clearly

imputing  knowledge of the discipline imposed on each of them, including Perry,

and as a result of having a majority of the vote on each Accident Review

Committee they were principally responsible for the ultimate disciplinary

decision, including the decision to terminate Perry. See Disher, 308 F. Supp. 2d

at 621. The mere fact that Dowd, Dillion, Doss, Bydalek, Tilery and Powell had

different terminal managers than Perry at the time of their company reportable

accidents is simply not relevant to similarly situated analysis as the terminal

manager alone is not principally responsible for Appellee's decision to terminate

him nor is there a requirement that the comparators are completely identical in

every respect.

In fact, the evidence plainly shows that terminal managers, including Mr.

Donnelly, did not have the authority to terminate an employee. Mr. Donnelly

simply would "request" or "recommend" termination as a direct result of the

Accident Review Committee's determination. See JA at 23-24 ¶3; JA at 30

¶¶38,50-51. After making the "request," approval would be granted from an

---

[2] See JA at 268,286,289,294,297,302,307,309,321-323.

34

unspecified source in which Mr. Donnelly or any other terminal manager would simply sign a termination letter that would be generated. See JA at 30-31 ¶39.

The undisputed evidence in this case clearly shows that the Plaintiff's termination was the result of the majority vote of three (3) members of Defendant's management team via Defendant's Accident Review Committee, determining Plaintiff's company reportable accident to be "preventable" and "reckless". See JA at 268. The inexplicably ignored evidence presented by Perry clearly shows a majority of the review committee or ***two out of the three*** voting members involved on Plaintiff's accident review committee were the same decision makers on the accident review committee's for each and every one of the comparator's Plaintiff identifies (except Paul Bydalek). Furthermore, Appellee does not dispute these other decision makers are common to Perry and his comparators. See JA at 343-346, 348 ¶27. Those members are Ms. Lynda Terry and Bruce Wrinkle and their knowledge of the prior disciplinary action taken on Perry's listed comparators was clearly imputed upon them when making their determination.

Appellee also notes that the District Court dismissed Tillery as a comparator because there is no evidence of Mr. Tillery's race. See JA at 364, footnote 2. However, Appellee has open admitted Mr. Tillery's race and has

35

never been in dispute by the parties.  See JA at 352-353 ¶10. Thus, the District

Court was in error to hastily dismiss Mr. Tillery as a comparator.


**3.  The District Court Committed Error in Determining Appellant Was Not Similarly Situated to His Comparators Because Appellee Deemed Appellant's Accident to Be "Reckless"**

The District Court determined the fact that Appellee's Accident Review

Committee did not consider any of the comparator's accidents to be "reckless," is

dispositive of Perry's claim. See JA at 364. The District Court goes as far to state

as undisputed fact that "[t]he only relevant inquiry during the Accident Review

Committee analysis is whether the accident was preventable and whether the

driver was reckless." See JA at 365. However, the applicability of this "reckless"

standard to Perry is the primary basis for Plaintiff's discrimination claim of

which there is undisputed evidence that there is no written policy of this

"reckless," standard, and the circumstances in which Appellee's assert this

"reckless" standard is clearly contradicted by the evidence.

It is well settled that on a motion for summary judgment all inferences are

made in favor of the non-moving party and the court cannot make credibility

determinations or weigh the evidence, or examine contradicted and impeached

evidence offered by the moving party. See Duggan at 462.

Here, the mere fact of whether the Accident Review Committee is even responsible for making a determination of "reckless" is directly contradicted by the evidence.

According, to MCA's policy, "MCA evaluates Employee performance with respect to accidents based on ***frequency***, ***severity***, and ***preventability***," **not recklessness**. See JA at 279. Mr. John Donnelly, designated by Defendant for purposes of its 30(b)(6) deposition, specifically stated that both the Accident Review Committee and the Accident Re-Determination Committee do not determine whether an accident rises to the level of "recklessness." See JA at 245-246.

**Q: And does it say anything on this document about recklessness?**

**A: No. But the Accident Re-Determination Committee is there to determine whether it was preventable or non-preventable, not whether they consider it to be company stand reckless or not.**

**Q: So the Accident Review Committee is there to determine whether it was preventable or non-preventable, not reckless, correct?**

**A: That's what I believe.**

(Donnelly Dep. 111-112; See JA at 245-246.)

These statements are in complete contradiction to the statements provided under penalty of perjury by Mr. Donnelly and Mr. Boone in their declarations

<u>See</u> JA at 30-34, ¶¶35-36, 38-39, 50, 55, 59; <u>See also</u> JA at 39 ¶7. More importantly, Mr. Donnelly expressly stated that there is no enumerated guideline or written policy that defines or even indirectly mentions how a determination of recklessness is made or that it is a standard used in MCA's accident review process. <u>See</u> JA at 140.

Thus, as here, where there is substantial contradicting and impeaching evidence as to how Appellee's classification of "reckless" is determined and was applied to Perry, there is a genuine issue of material fact and it was in error for the Court to blindly accept Appellee's designation of "reckless" as a differentiating factor in Plaintiff's comparator analysis.

**4. Appellant Has Provided Sufficient Evidence to Demonstrate that the Appellee's Legitimate, Nondiscriminatory Reasons for Terminating Him Are Merely Pretext for Unlawful Discrimination.**

Appellee advances as its legitimate non-discriminatory reason that Perry was terminated because his accident was not simply determined to be "preventable," but was additionally "reckless." Under the <u>McDonnell Douglas</u> framework, once an employer has met its burden of providing a legitimate nondiscriminatory explanation for its decision, the plaintiff is afforded the

"opportunity to prove, by a preponderance of the evidence, that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). That is, Plaintiff could attempt to establish that he was the victim of intentional discrimination by "showing that the employer's proffered explanation is unworthy of credence." *Id*. at 256. *See also* Blankenship v. Buchanan Gen. Hosp., 140 F. Supp. 2d 668, 674 (W.D. Va. 2001) (explaining that pretext can be shown by demonstrating "weaknesses, implausibility's, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action" (internal quotation marks omitted) (*citing* Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)). Alternatively, under the mixed-motive framework, a plaintiff can establish a claim of racial discrimination if he can demonstrate that, although defendant's termination decision "may have been based upon legitimate, non-discriminatory reasons, it was also at least in part motivated by racial bias on the part of a relevant decision-maker." Murray v. United Food & Comm. Workers Union, 100 Fed. Appx. 165, 175 (4th Cir. 2004) (*citing* Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004)). Hill set forth the two standards (mixed-motive and pretext) by which a plaintiff in an employment discrimination case can "avert summary judgment." Hill, 354 F.3d at 284.

39

In mixed-motive cases, "the employee need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, but must present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor for the employment practice." Id. (internal citations and quotation marks omitted). It is sufficient for the Appellant to demonstrate that the termination decision was motivated by "both permissible and forbidden reasons." Hill, 354 F.3d at 284; Reed v. Town of Williston, 2010 U.S. Dist. LEXIS 31704, 2010 WL 1409425, * 12 (D.S.C. 2010). The Supreme Court has specifically held that "direct evidence of discrimination is not required in mixed-motive cases." Desert Palace, Inc. v. Costa, 539 U.S. 90, 101-02, 123, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). Thus a lack of direct evidence is, by itself, no impediment.

As stated previously, the phrase "reckless" is not outlined or even mentioned in the MCA employment handbook. More importantly, Appellee does not dispute that there is no enumerated guideline or written policy that defines or even indirectly mentions how a determination of recklessness is made or that it is a standard used in MCA's accident review process. See JA at 140; See also Lightner v. The City of Wilmington, 498 F. Supp. 2d 802 (E.D.N.C. 2007) (affirming pretext shown where Defendant had no formal written policy).

The only standards that are mentioned to be determined by the Accident Review Committee contained in Appellee's policies and guidelines is whether the accident was "non-preventable" or "preventable." See JA at 279. As a result, the evidence and explanations of why Perry's accident was "reckless" is replete with inconsistencies, incoherencies, contradictions, and credibility issues.

For example, Mr. John Donnelly, designated by Defendant for purposes of its 30(b)(6) deposition, specifically stated that both the Accident Review Committee and the Accident Re-Determination Committee do not determine whether an accident rises to the level of "recklessness." See JA at 245-246.

**Q: And does it say anything on this document about recklessness?**

**A: No. But the Accident Re-Determination Committee is there to determine whether it was preventable or non-preventable, not whether they consider it to be company stand reckless or not.**

**Q: So the Accident Review Committee is there to determine whether it was preventable or non-preventable, not reckless, correct?**

**A: That's what I believe.**

(Donnelly Dep. 111-112; See JA at 245-246.)

Despite this statement, Donnelly contradicts himself in his declaration stating "Mr. Perry's Appeal was reviewed by the Accident Re-Determination Committee which upheld the Accident Review Committee's determination that

41

Plaintiff's November 2011 accident was both preventable and reckless." See JA at 34 ¶55. Further, Mr. Boone in his declaration states the Re-Determination Committee found Mr. Perry to be reckless See JA at 39 ¶7. Yet, shockingly, a simple review of the Accident Re-Determination Committee's determination notes and letter to Perry about its determination indicates a complete absence of a "reckless" finding. See JA at 285, 326. Despite, this clear contradiction, the District Court determined the Re-Determination Committee upheld the Accident Review Committee's determination that Plaintiff's November 2011 accident was both preventable and reckless. See JA at 361. The undisputed evidence is that the Re-Determination Committee's determination is final decision of the Appellee. See JA at 245, 280. However, Perry's termination was upheld. See JA at 34 ¶55. With such clear contradictions of material facts, it was in error for the District Court to accept Appellee's allegation as true.

Even more alarming is that Mr. Boone in his declaration states "I remember serving on the Accident Re-Determination Committee of former Truck Driver Craig Perry." See JA at 39 ¶4. However, MCA's policy states "[t]he Re-Determination Committee, however, will make a new determination *without knowledge of* the original preventability determination or *the Employee's identity*." See JA at 279.

42

Also, when asked how Defendant defines "reckless," Mr. Donnelly stated "speed, too fast for conditions, not slowing down" (See JA at 144), yet in Mr. Donnelly's accident review notes for Mr. Perry he states, "failure to keep following distance and keep proper lookout…recklessness/he was familiar with the area/knew the hazards." See JA at 269. To make matters even less clear, during Mr. Donnelly's deposition, the exact reason (familiarity with the area) stated on Perry's Accident Review notes to be "reckless" was asserted to not be a relevant factor in determining "reckless." See JA at 186.

> **Q: Does it matter, you said as part of your answer they need to keep a lookout. Does it matter if they're familiar with the route they're driving?**
>
> **A: No, not really. I mean, because as a professional driver I expect him to be on the – have a proper lookout, maintaining proper following distances, whether it's a road that he knows or a road that he doesn't know…**

 (Donnelly Dep. 75; See JA at 186.)

Going even further, in Appellee's attempt to find a similarity between the accident of Perry to Appellee's advanced comparator, Wilbur Stevens, Appellee asserts for the first time during litigation that Mr. Stevens and Perry were found to have been reckless because of being involved in a "rear-end collision," despite

43

saying nothing regarding such a criteria previously. <u>See</u> JA at 35 ¶61, 162, 185-186.

> **Q: And what specifically in relation to Mr. Stevens on his accident rise to a level of recklessness?**
>
> **A: Once again, speed was the main issue.**

(Donnelly Dep. 51; <u>See</u> JA at 162.

Again, like the Accident Review Committee notes for Perry, Mr. Stevens' Accident Review Committee notes are completely absent any note of a "rear-end collision" being a factor in its decision. <u>See</u> JA at 289.

As in this case, "[t]he fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext." <u>Dennis v. Columbia Colleton Medical Center, Inc.</u>, 290 F.3d 639, 647 (4th Cir. 2002).

As applied to the expectation cited above, Defendant's most recent explanation relating to a "rear-end collision" was only offered by Appellee's counsel. *See* <u>Murray v. Akima Corp.</u>, 2009 U.S. Dist. LEXIS 20198 at *22 (E.D.N.C. 2009)("In a situation such as this, where the explanation is offered only through defense counsel and not by the actual decision-maker, the inference of pretext is even stronger.")

On cross-examination, after Appellee's counsel inquired as to whether a rear end collision had anything to do with MCA's determination for recklessness,

Mr. Donnelly, for the very first time, mentioned and acknowledged such a factor. See JA at 185. Noticeably, none of the voting participants on the Accident Review Committee notes for Perry mention anything relating to a rear end collision in making their determination of "reckless." See JA at 269. Additionally, the only documented evidence in the record referring to Perry's termination being related to a "rear-end collision" was a chart created by Appellee's Counsel during the discovery process and was not within Appellee's business records, making such a document inadmissible. See JA at 236, 320; Fed. R. Evid. 803(6)(B). This chart which is further incorporated into John Donnelly's Declaration is not only inadmissible for not being supported by any document in the record used in the regular course of Appellee's business, but contains plainly false information. See JA at 35. For example, the listed discharge dates for Wilbur Stevens of November 19, 2011 and Craig Perry on November 28, 2011 are actually December 19, 2011 and December 20, 2011. See JA at 35 ¶61, 271, 287.  Furthermore, prior to this new explanation of a rear end collision being determinative of Perry being "reckless," Mr. Donnelly definitively stated a completely different explanation as the ***sole*** reason. See JA at 144.

**Q: Can you tell me what specifically in [Perry's] accident rises to the level of recklessness in your opinion?**

**A: Speed, too fast for conditions, not slowing down.**

**Q: Was that the sole factor?**

**A: For me it was.**

(Donnelly Dep. 33; <u>See</u> JA at 144.)

Yet, as stated previously, that explanation was not stated in the Review Committee note. Clearly, this "rear-end collision" explanation was offered solely by defense counsel and Appellee later adopted it as a post-hoc justification for its decision to terminated Perry.

Lastly, despite the inconsistency in which Defendant allegedly determine "recklessness," there is an inference of race discrimination in that of all the other employees identified, virtually every white driver was afforded some lenient consistency in its application of policy resulting in a final warning and being placed on critical notice before being terminated. For example, Appellee alleges that "roll-over" accidents are considered by MCA to be in the most serious category of accidents and that MCA instructs its drivers to hit deer in order to avoid swerving to avoid them. <u>See</u> JA at 27 ¶21. According to Appellee "[t]his policy is in place because swerving a tractor trailer to avoid a deer is extremely dangerous, can result in the jackknife of a tractor trailer, and thus puts the driver and the public in greater danger than if the driver simply struck the deer." <u>See</u> JA at 342 ¶10. Undoubtedly under this standard if one of MCA's driver both swerved to avoid hitting a deer and "rolled-over" the truck, such would amount to

46

being "reckless" and the discharge of the employee. Yet, when Caucasian truck driver Samuel Dillon swerved to avoid hitting a dear, rolled-over his truck, resulting in a total-loss of the vehicles, Appellee did not determine his accident to be "reckless" or terminate Mr. Dillon See JA at 296-297, 333 ¶9. In fact, Dillion returned to work the very next day, had yet another "preventable" accident within the two (2) year critical notice period, and still was not terminated as a result. See JA at 333 ¶9.

Most significantly, only two full-time drivers identified were terminated after a single preventable accident that resulted in no injuries or significant damages to company property. Those two persons are Plaintiff and Larry Powell, whom just happen to be African American.

Whether the distinguishing characteristics advanced by Appellee sufficiently rebut Perry's assertion of race discrimination involve questions of fact and credibility more appropriately weighed by a jury. Thus, for the reasons stated above, Plaintiff contends he sufficiently demonstrated pretext to defeat Defendant's Motion for Summary Judgment.

**5.  The District Court committed Error in Holding Wilbur Stevens is the Closest Comparator to Appellant.**

Lastly, the District Court held that Wilbur Stevens is the closest comparator to Plaintiff is in error. See JA at 365. This determination is clearly

made by weighing the credibility of Defendant's explanation of the particular factors used in making determinations of "reckless" and inferring several disputed material facts in favor of the Defendant. For example, the order explicitly accepts Appellee's explanation as true that a rear-end collision is the type of accident determined by MCA's Accident Review Committee to rise to the level of "reckless" despite the numerous inconsistencies and contradictions previously discussed and most importantly, that there is no mention of a rear-end collision in the Accident Review Committee's notes for Perry or Stevens and is not mentioned anywhere within MCA's written policies or guidelines.

Moreover, Wilbur Stephens and Perry are not proper comparators because Mr. Stephens had a prior company reportable accident before the final accident that resulted in his termination. See JA at 286. See also Street v. United Parcel Service, Inc., 822 F. Supp. 2d 1357, 1368 (M.D. Ga. 2011) (determining that a co-worker was not a comparator because, inter alia, "no evidence exists that [the co-worker's] record shows the history of disciplinary actions, including reprimands and termination, that Plaintiff's employment history reflects"). As it is undisputed that Plaintiff has not had any prior company reportable accidents during his employment with the Defendant where Mr. Stephens has, they are not similarly situated.

48

Further, the District Court dismisses that Stevens is a part-time employee. See JA at 163 (explaining that DRVCA stands for casual driver, and casual driver means part-time driver). As such, he cannot be a proper comparator. See Kelley v. United Parcel Serv., Inc., 4:10-CV-1420-RBH, 2012 WL 3765180, at *4 (D.S.C. Aug. 30, 2012) (explaining that part-time employees are not similarly situated with full-time employees (citing Ilhardt v. Sara Lee Corp., 118 F.3d 1151, 1155 (7th Cir. 1997)), aff'd, 12-2343, 2013 WL 2480211 (4th Cir. June 11, 2013).

Most importantly, the Court dismisses that Stevens' accident was much more severe than Plaintiff's accident, simply alluding that both accidents were deemed by Appellee to be "preventable" and "reckless". See JA at 365. However, this analysis must be sophisticated, because "an unprincipled conception of 'similarity' and 'comparability'" is "a structural flaw that renders the fact-finding process 'clearly erroneous.'" Lightner, at 809 citing Moore, 754 F.2d at 1107. As discussed previously, Mr. Stevens accident resulted in injuries requiring three people to be transported to a hospital, was also going 15mph in excess of the speed limit while on cruise control, and both vehicles suffered extensive damage. See JA at 289.

Lastly, and most importantly, there are genuine issues of material fact as to whether the circumstances with Stevens' termination created an inference of discrimination. An example of this would be when the defendant fires someone outside the Appellant's protected class in order "to disguise its act of discrimination toward the plaintiff." *See* Miles at 488 (*citing* Brown v. McLean, 159 F.3d 898, 905-06 (4th Cir. 1998)). As here "[w]hen an employer picks one of a list of …qualifications and claims that it was actually decisive without regard to the others, the jury is certainly permitted to conclude, in light of the totality of the evidence, that this may have been done as post hoc justification of a decision made on other grounds." Dennis v. Columbia Colleton Medical Center, Inc., 290 F.3d 639, 647 (4th Cir. 2002).

A simple comparison between the severities of Perry's accident to Stevens accidents are so substantial that they "jump off the page and slap [you] in the face." Dennis v. Columbia Colleton Medical Center, Inc., 290 F.3d 639 (4th Cir. 2002)(*citing* Deines v. Texas Dept. of Protective Services, 164 F.3d 277, 280-81 (5th Cir. 1999). In Perry's accident, he was driving under the posted speed limit, in icy conditions, when he stuck another vehicle, which resulted in relatively minor damage to the vehicles involved, no one was injured as a result of the accident, and both vehicles involved were able to drive away from the scene of the accident. See JA at 268-269. However, in Stevens' accident, he was

50

recklessly exceeding the posted speed limit, three (3) passengers in the other vehicle were transported from the scene due to their injuries, and both vehicles had to be towed from the scene of the accident. <u>See</u> JA at 289. The differences in the severity of these two accidents are anything but similar.

Further, the dates of Perry and Stevens accidents occurred weeks apart, yet the decisions to terminate both Perry and Stevens occurred shockingly close in time. Mr. Stevens accident occurred on November 17, 2011 and Perry's on November 28, 2011, approximately eleven (11) days after each other. The evidence in the record shows that after the Accident Review Committee makes a decision, the terminal manager based on the voting majority's opinion, fills out a form entitled "Progressive Discipline Coordination Form" in which a specified discipline is requested to be approved by some higher decision maker within Appellee's management. <u>See</u> JA at 167. When Mr. Donnelly was questioned about when the Progressive Discipline Coordination Form requesting termination of Mr. Stevens was actually submitted, the response was evasive.

**Q: Okay. And did you recommend [Stevens] termination?**

**A: I did.**

**Q: And can you tell me when this was submitted?**

**A: I submitted it – <u>well, I completed it on the 23rd</u>.**

**Q: Okay. And very – just like the one for Mr. Perry, it does have a signature on, right, the discharge received by I think a DB 12/19/2011.**

(Donnelly Dep. 56; <u>See</u> JA at 167.)

A reasonable jury could certainly infer from the evidence that Mr. Stevens requested termination was submitted at some time after the date of November 23, 2011 indicated as the completion date on the form and was likely submitted on December 19, 2011 as is indicated by the handwritten date by a "DB." <u>See</u> JA at 292. The reasons why both Perry and Stevens' termination requests were both received on December 19, 2011 despite Mr. Stevens' form being completed nearly an entire month earlier can likely cause a reasonable jury to conclude that the delayed termination of Mr. Stevens' was an attempt to cover up discrimination of Perry. This is especially so when Appellee has not been able to provide evidence of any other evidence of drivers besides Stevens and Perry that were determined to be "reckless" during the Accident Review Committee process.

Lastly, there are genuine issues of material fact as to whether Mr. Stevens was terminated after Perry. Mr. John Donnelly, when asked about when Mr. Stevens was terminated indicated the termination date was actually December 20, 2011, one day after Perry's termination.

**Q: Do you recall when you terminated him?**

52

**A: If I'm not mistaken, it was the same day as – or the letter was dated the same day as Mr. Perry. <u>But I actually spoke to him on the day after, the 20th I think, of December.</u>**

(Donnelly Dep. 53; <u>See</u> JA at 164.)

Thus, similar to the holding in <u>Williams</u>, Stevens would not be a proper comparator if Stevens was terminated after Perry. Thus, the question of whether Stevens was terminated after Perry is a genuine issue of material fact that should be resolved before a jury.

**6.  The District Court Committed Error in Weighing Facts That Are Completely Absent From the Record.**

The District Court in closing it opinion determines that a "fact weighing heavily against Plaintiff is that of the six drivers who were supervised by John Donnelly (Plaintiff's supervisor at the time of his termination)…Plaintiff is the only African-American." <u>See</u> JA at 365. The undersigned is dumbfounded on where the District Court obtains this fact. The uncontroverted testimony by John Donnelly is that he supervised 350-400 drivers and 10-15% of those drivers were African American. <u>See</u> JA at 132,179. Thus, the District Court "weighing heavily" against Appellant this erroneous and unsubstantiated fact is reversible error.

## CONCLUSION

The Appellee is not entitled to summary judgment as a matter of law because the Appellant has presented facts on which, in viewed in a light most favorable to him, a jury might return a verdict in Appellant's favor. Moreover, the Appellant has demonstrated that there are genuine issues of material facts which can only be decided by a trial. Accordingly, this Court should reverse the ruling of summary judgment by the District Court and remand this case for trial. Dated this the 22nd day of April, 2014.

Respectfully submitted,

**/s/ Ross S. Sohm**_____

Ross S. Sohm
Attorney for Plaintiff
N.C. Bar No. 40796
101 N. McDowell St., Ste  110
Charlotte, NC 28204
P: (704)804-8121
F: (704)706-9143
E: rsohm@sohmlaw.com

## <u>REQUEST FOR ORAL ARGUMENT</u>

Appellant respectfully request this Court to grant oral argument.

Ultimately the proper weight to be given to the facts put forward by the Plaintiff-Appellant, can be clarified through oral argument.

Respectfully submitted,


**/s/ Ross S. Sohm_____**
Ross S. Sohm
Attorney for Appellant

## <u>CERTIFICATE OF COMPLAINCE</u>

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(b) because it contains less than 14,000 words, including the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that this brief complies with the type face requirement of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14pt Times New Roman.

Dated: April 22, 2014.

**/s/ Ross S. Sohm**_____
    Ross S. Sohm
    Attorney for Appellant

## CERTIFICATE OF FILING AND SERVICE

I certify that on the 22nd day of April, 2014, a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following or that it was mailed to all parties, as addressed as shown below:

Michael Wade
Attorney for Defendant
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244

I further certify, on this 22nd day of April, 2014, that the required number of bound copies of the Brief of Appellant will be hand-filed with the Clerk of Court tomorrow.

/s/ **Ross S. Sohm**_____ _
Ross S. Sohm
Attorney for Appellant
N.C. Bar No. 40796
101 N. McDowell St., Ste  110
Charlotte, NC 28204
P: (704)804-8121
F: (704)706-9143
E: rsohm@sohmlaw.com

57